Filed 9/28/21  In re M.G. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.G., a Person Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>M.G.,<br><br>        Defendant and Appellant. | A161940<br><br>(Napa County Super Ct. No. 20JD000060) |
| In re M.G., a Person Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.B.,<br><br>        Appellant. | A162302<br><br>(Napa County Super. Ct. No. 20JD000060) |

M.G. (Father) is the presumed father of minor M.G., and J.B. is godmother and first cousin twice removed to the minor.  In this consolidated appeal, Father and J.B. appeal from the juvenile court's order denying

1

placement of the minor with J.B. under the "relative placement" provisions of section 361.3 of the Welfare and Institutions Code.[1] We hold the juvenile court did not abuse its discretion in concluding that M.G.'s placement with J.B. would not be in the child's best interests.

Father also purports to appeal from the order sustaining the allegations in the juvenile dependency petition and the disposition order removing M.G. from his parents' custody. However, we lack jurisdiction to review these issues, as Father's notice of appeal clearly and unmistakably indicated his intent to appeal only from the order denying relative placement. But even if we were to consider such matters, we would conclude that Father forfeited his challenge to the disposition order by submitting to the recommendations of Napa County Health and Human Services, Child Welfare Services Department (Department),[2] and that substantial evidence supported the jurisdiction findings.

Finally, we conclude the Department did not sufficiently comply with the inquiry and notice requirements of the federal Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.). Accordingly, we conditionally reverse the judgment and remand the matter to the juvenile court to ensure the Department's compliance with ICWA.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Section 300 Petition

On September 24, 2020, the Department filed a dependency petition alleging that newborn M.G. was at substantial risk of serious physical harm

---

[1]    Further section references are to the Welfare and Institutions Code unless specified otherwise.

[2]    In so concluding, we note the January 27, 2021 minute order of the disposition hearing should be corrected to reflect that Father submitted on the Department's recommended case plan.

due to the inability of Father and A.Y. (Mother) to adequately supervise and protect him (§ 300, subd. (b)(1)) stemming from Mother's untreated mental illness (bipolar disorder), developmental disability, and substance abuse; Father's "volatile impulsive behaviors" and past instances of intimate partner violence; and both parents' extensive histories of homelessness.

As relevant here, paragraph b-4 of the petition alleges that on July 25, 2020 and October 11, 2019, Father was "arrested for Intimate Partner Violence after threatening to kill [Mother] and their unborn child. [In] [t]he second incident [Father] pushed [Mother] to the ground and struck her three times in the chest. [Mother] was granted an [emergency protective order]; however, she failed to pursue a permanent restraining order and continued residing with [Father]." Paragraph b-5 alleges that Father had "expressed a threat to physically harm the child prior to his birth. The father has volatile impulsive behaviors that places [M.G.] at risk of serious harm or injury."

The petition further alleges that M.G. was left without any provision for support (§ 300, subd. (g)) due to Mother's homelessness and Father's lack of stable housing. Specifically, paragraph g-1 alleges that Father "was evicted from stable housing, the Rainbow House, because he engaged in a physical altercation with another resident. [Father's] impulsive and explosive behaviors place[] the minor . . . at serious risk of harm or injury. [Mother] . . . is unable to provide adequate care, protection and shelter for the minor, . . . placing the newborn minor at serious risk of harm and without safe and adequate housing."

**B. Detention Report and Hearing**

The Department filed its detention report recommending that M.G. be detained in foster care. According to the report, Mother had been in and out of the home of her great-grandmother, C.H., for approximately 10 years and

3

struggled to maintain stable housing. Mother was "cognitively functioning at the level of a ten year old," had an IQ in the 50's or 60's, and had been under limited conservatorship for approximately 10 years.

The Department also reported on Father's criminal history, his parole status for possession and sale of a controlled substance with gang and firearm enhancements, and statements from parole officers that Father was "very dangerous, extremely volatile and impulsive" and "non-compliant during his parole" with regard to alcohol consumption.

The Department identified two individuals for assessment as relative or "nonrelative extended family member" (NREFM) placements: J.B., the minor's "Maternal cousin and Godmother," and C.C., the minor's "Maternal cousin." Meanwhile, J.B. filed a relative information form (Judicial Council Forms, form JV-285) requesting that M.G. be placed with her in the event he was removed from his parents' custody.[3]

At the detention hearing on September 25, 2020, both Mother and Father appeared, and Father was given alleged father status.[4] J.B. also appeared, identifying herself as Mother's cousin and M.G.'s godmother and claiming she had a "Certificate in Midwifery."

Maternal grandfather, J.H., was present and told the juvenile court there was Cherokee ancestry on Mother's side of the family through both himself and maternal grandmother, A.L. J.H. provided the court with his name and birthdate, the name and birthdate of his mother, C.B. (M.G.'s maternal great-grandmother), and the name of his father, R.H. (M.G.'s maternal great-grandfather). Mother provided the court with the name of

---

[3]     J.B. filed additional relative information forms (JV-285) in November 2020 and December 2020, along with supporting documents.

[4]     He was eventually elevated to presumed father status.

her mother, A.L., and J.H. provided a partial birthdate for A.L. but said he was unsure of its accuracy. As to A.L.'s birthdate, the Department informed the court, "I believe we have that at the Department."

The Department then informed the juvenile court that it was having difficulty getting Mother to sign a consent-to-treat form authorizing medical care for M.G. in foster care. The court asked Mother if she was willing to sign the form, and Mother responded, "Yeah, I will sign it." However, J.B. told the court that M.G.'s parents were "hesitant to give a blanket permission to treat" and wanted to "be involved in the decisions regarding medical care." J.B. raised concerns that M.G. was exposed in utero to Mother's antiseizure medication and was born prematurely, and that he had "interrupted breastfeeding." The court reassured J.B. that the Department's social workers were careful in making sure that proper care was given.

The juvenile court ordered M.G. placed in an approved Napa County Resource Family Home.

### C. Initial ICWA Notice

Three days after the disposition hearing, the Department filed and served Judicial Council Forms, form ICWA-030, Notice of Child Custody Proceeding for Indian Child (hereafter ICWA notice) by certified mail to the Secretary of the United States Department of the Interior, the Sacramento Area Director of the Bureau of Indian Affairs, and to representatives of the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee.

The ICWA notices included the following information regarding M.G. and his family: the child's name, birthdate, and place of birth; Mother's legal and maiden names and birthdate; Father's name and birthdate; maternal grandmother A.L.'s name and the partial birthdate given by J.H. at the

5

detention hearing; the names and birthdates of maternal grandfather J.H. and maternal great-grandmother C.B.; and the name of maternal great-grandfather R.H.[5]  The spaces for information on M.G.'s other great-grandparents (i.e., A.L.'s parents) were designated "Unknown."  Under "Other relative information," the IWCA notices listed the names of maternal great aunt, Ad.L., and "second cousin[s]" J.B. and C.C.

In October 2020, the Department filed ICWA compliance documents showing that each recipient had received the ICWA notice.

### D. Jurisdiction Reports and Hearing

The juvenile court initially set a combined jurisdiction and disposition hearing for October 2020.  The court later bifurcated the hearings and continued the jurisdiction hearing to November 2020.  The court granted a further continuance of the jurisdiction hearing to December 16, 2020.

### 1. Initial Jurisdiction Report

The Department filed its initial jurisdiction report in October 2020, recommending that the juvenile court establish jurisdiction over M.G.  The report indicated that ICWA "does or may apply" and that Mother had reported "Cherokee ancestry through both the maternal grandfather [J.H.] and the maternal grandmother [A.L.]."  Father reported no known Native American ancestry on his side of the family.

The Department interviewed Mother's cousin, C.C., who reported that Mother was born addicted to methamphetamine, and that Mother and Father were living in the garage of Mother's great-grandmother, C.H., which was unsanitary and had " 'stuff piled up everywhere.' "  C.C. told the Department that although she had spent many summers with Mother as children, she

---

[5]    Notably, the spelling of J.H. and R.H.'s shared last name in the IWCA notices did not match the spelling that J.H. gave at the detention hearing.

6

"never knew or interacted with maternal cousin, [J.B.], prior to" the dependency proceedings. C.C. expressed her desire to have Mother and great-grandmother C.H. relocate to Idaho where Mother had family.

Maternal great aunt, Ad.L., told the Department she was concerned about Mother's ability to care for M.G. in light of Mother's developmental and cognitive delays. Ad.L. also expressed concerns that C.H. could be evicted for allowing Mother and Father to live in her garage. C.H. had once kicked the parents out of the house when she discovered that they had used her credit cards without her permission. The jurisdiction report included photographs showing that the parents' sleeping area in the garage contained low hanging electrical cords, an exposed hot water heater, exposed garbage bins, and items unsafely stacked in piles.

Father was overseen by a parole officer since 2013, and his parole term had been repeatedly extended. The parole officer confirmed Father's history of homelessness and told the Department that Father had no verifiable source of income.

The jurisdiction report set forth Father's extensive criminal history, including incidents of intimate partner violence against Mother. According to a Napa Police Department report, Mother called the police on October 11, 2019, and reported that Father had "pushed her in the chest with two hands three separate times causing her to fall on the ground," and after she got up and went after him, he "proceeded to hit her in the chest with an open right hand" before he "ran off." Nevertheless, Mother told the police "she did not want [Father] arrested for the assault" and declined an emergency protective order. The police officer was not able to locate Father.

In July 2020, Mother reported to the police that during an argument, Father damaged a door inside the residence and told Mother "he was going to

kill her and kill their unborn baby." Mother requested and obtained an emergency protective order and told the police officer she wanted to press charges against Father for threats. The police officer later made contact with Father and served him with the emergency protective order. Thereafter, Mother did not come to the police department to press charges; nor did she return the police officer's phone calls. According to C.C., after the incident in which Father threatened to kill Mother and the unborn baby, Mother called Ad.L. and asked her to bring her to Idaho; however, before they could make arrangements, Mother " 'disappeared again.' "

In August 2020, the Napa Police Department reported Father's altercation at the Rainbow House shelter where he and Mother had been living. According to the report, Father got into an argument with an individual who was with his girlfriend and their infant child. Father pushed the individual, caused a screen door to hit him, and later "said something to the effect of, you won't be here later to protect your dumbass kid" before driving away.

C.C. reported an incident two days before M.G.'s birth in which Father "charged towards [Mother's] great-grandmother and threatened her." Maternal grandfather J.H. had to intervene and called the police.

In an interview with the Department, Father said he had never been arrested for domestic violence. He claimed that Mother "made a false allegation and [he] was detained in the county jail for one night . . . ." Father denied that their arguments turned physical or that he threatened their baby in utero. He claimed the garage where he and Mother lived was safe and clean, and he denied ever having been kicked out of C.H.'s home.

8

### 2. October 23, 2020 Addendum Report

The Department presented the juvenile court with additional information regarding six emergency 911 calls made from the address where Mother and Father resided with C.H., including the following. In January 2020, Mother reported that Father had assaulted her " 'over the last several days' in the great-grandmother's home and so she went to stay in Vallejo." In June 2020, Mother called 911 and reported that Father, who had been drinking in violation of his parole conditions, had a stick and was threatening to hurt her. Mother, who was " 'crying' " and " 'frantic,' " told the dispatcher "she did not want the father to have contact with her and the unborn child due to being in fear of him." In July 2020, a community member called to report that "the mother is pregnant and her baby's father" had broken a door in the great-grandmother's home, and that Mother was " 'afraid and scared' " of Father. In September 2020, a community member reported "screaming and yelling" and furniture possibly being thrown inside the home.

### 3. November 25, 2020 Addendum Report

In an addendum report, the Department notified the juvenile court that it had denied J.B.'s request to be an emergency placement for M.G.

In explaining its decision, the Department noted that J.B. had persisted in her claims that M.G. was at risk of developmental and cognitive delays and physical and emotional deficits despite the evaluations of his medical care providers concluding he was healthy. J.B. also raised concerns in her November 2020 relative information form (JV-285) that M.G. was diagnosed with a cephalohematoma and, in a letter to the Department and the parties' counsel, made a "highly alarming" suggestion that the foster care provider was responsible for the cephalohematoma—even though it was explained to her that this was a common condition caused by pushing during

9

labor and delivery that did not require medical follow-up. In the Department's view, J.B.'s "perseverance and insistence on the child having special medical needs makes it seem that she is either unwilling or unable to trust the department and [M.G.'s] medical care providers, and that ongoing positive interactions with these professionals would be challenging for her, due to her distrust." Furthermore, the Department questioned why, despite her stated concerns for the health of M.G., J.B. discouraged Mother from signing the consent-to-treat form at the detention hearing.

The Department also suggested that J.B. had violated a confidentiality agreement she signed at a child and family team meeting by sending a letter to several individuals, including an attorney who had not yet been appointed as Father's counsel, detailing M.G.'s health issues.

The decision to deny J.B.'s placement request was also based on concerns about her honesty. The Department noted its discovery that J.B. was not a certified nurse midwife as she had claimed. The Department further reported that J.B. acted in a "duplicitous manner" by attempting to arrange an in-person visit with M.G. through his foster caregiver despite having been told by the Department that in-person contact was not permitted due to the COVID-19 pandemic. J.B. had also made "false allegations in an effort to have [M.G.] moved from the foster home" by claiming that Mother had witnessed the foster caregiver doing drugs in the past. When asked about this allegation, Mother denied ever having witnessed the foster caregiver doing drugs. The Department further accused J.B. of falsely telling Mother that the Department intended to move M.G. to Idaho with her other relatives, causing Mother "to become emotionally distraught."

The Department concluded that J.B. was not capable of supporting a plan of family reunification because she had caused distress to the parents

10

and distrust between them and the Department. According to the Department, J.B. was " 'harassing' " Mother and ignoring Mother's wishes about breastfeeding M.G., as J.B. planned to breastfeed M.G. by taking lactation supplements, despite Mother's discomfort with this.

### 4. December 14, 2020 Addendum Report

The Department reported that Father had posted a video clip on social media of himself in the garage of C.H.'s home smoking a substance out of a clear glass pipe, in apparent violation of his parole restrictions. The video also showed multiple flammable items on top of an electric heater next to the bed. The Department further reported that Father had missed four visits in a row with M.G. claiming scheduling conflicts due to work, even though he acknowledged he was not working.

### 5. Additional ICWA Notices

The Department gave additional ICWA notice of the continued jurisdiction hearing to the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee. It appears the ICWA notices were unchanged from the prior notices. For maternal grandmother A.L., the ICWA notice still only provided a partial birthdate, and the spaces for information on M.G.'s great-grandparents/A.L.'s parents were still marked as "Unknown." The Department filed ICWA compliance documents showing that the second set of ICWA notices had been received by representatives of the tribes.

On November 4, 2020, the Department filed an ICWA compliance document attaching a letter from the Indian Child Welfare Advocate for the United Keetoowah Band of Cherokee Indians. The letter stated, in relevant part, "Based on the information that has been provided to us, we are unable to establish Keetoowah heritage," and accordingly, M.G. was ineligible to

become a member and was not recognized as a member of the tribe. The letter went on to note, "This determination is based on the information that was exactly provided by you. All incorrect or omitted family information could invalidate this determination."

After the jurisdiction hearing was continued to December 2020, the Department gave notice of the continued hearing date to the Cherokee Nation and the Eastern Band of Cherokee Indians and later filed ICWA compliance documents showing receipt of the third set of ICWA notices. The ICWA notices contained mostly the same family information as before, except that the birthdate for maternal grandmother, A.L., was now designated "Unknown." There was still no information on A.L.'s parents, and J.H. and R.H.'s last names were still spelled differently than as indicated at the detention hearing.

The Department also filed an ICWA compliance document attaching a letter from the Eastern Band of Cherokee Indians stating, "Our office has reviewed the Eastern Band of Cherokee Indians' tribal registry and, based on the information received from you, [M.G.] is **neither** registered nor eligible to register as a member of this tribe." A further ICWA compliance document filed by the Department attached an email correspondence from the eligibility supervisor of the Cherokee Nation stating, "Neither parent nor child are registered as Cherokee Nation tribal members. [¶] The child is not an 'Indian child' in relation to the Cherokee Nation as defined in the Federal ICWA. . . . Any incorrect or omitted information could invalidate this determination. An official response letter has not been generated yet but will be once the received notice has been fully researched and processed."

### 6. Jurisdiction Hearing

At the December 16, 2020, contested jurisdiction hearing, the court admitted the Department's jurisdiction report and addendum reports without objection. The court heard testimony from Mother's family friend, M.T.; Mother's great-grandmother, C.H.; social worker Tawnya Stansell; Father; and Mother. As relevant here, C.H. denied that the arguments between Mother and Father turned physical. She further testified as to a "slight disagreement" she had with Father but claimed he never threatened or charged at her. Both M.T. and C.H. attested to Mother's ability to care for young children.

Social worker Stansell testified in relevant part that Father had spent one night in jail following one of the incidents of intimate partner violence alleged in paragraph b-4 of the petition. Stansell acknowledged that after Father threatened Mother with a stick, he was detained for public drunkenness, not domestic violence. The juvenile court clarified on the record that the Department was not claiming Father had a domestic violence conviction—only that Mother had claimed domestic violence by Father.

Father disputed the Department's allegations against him, claiming he never got into a physical altercation with Mother or pushed her in the chest, never threatened to harm their unborn child, and never had an arrest for domestic violence. He testified he got into "shouting matches" with Mother and admitted he was served with an emergency protective order in July 2020. He denied the police report that he was banging on the door with a stick, and he claimed he and Mother left the Rainbow House voluntarily because it was not a good environment for a newborn.

Mother likewise denied that Father had threatened to harm her, the baby, and C.H., and that he had physically harmed her. She admitted she

13

called the police and obtained an emergency protective order against Father in July 2020, but insisted she had made false claims against him because she was acting on past traumas and "thinking about something that happened in [her] past."

Finding both parents' testimony lacking in credibility, the juvenile court concluded that the allegations of the petition were sustained by a preponderance of the evidence, and that M.G. was a child described by section 300, subdivisions (b) and (g). The court found that Father "has expressed a threat to physically harm the child" and "is also engaged in intimate partner violence. It's unhealthy for a child to be in a home that is volatile and violent, and I think that the child being placed with father puts the child at risk of . . . growing up in a home where domestic violence is a normal part of daily life[.]"

The juvenile court also found that although there was initially reason to believe ICWA might apply, after inquiry and due diligence from the Department, "there is currently no reason to know this case involves an 'Indian Child', [and] the court will proceed as if ICWA does not apply." The court set the matter for a disposition hearing.

**E. Disposition Report and Hearing**

In its disposition report, the Department recommended that the juvenile court find M.G. to be a dependent, with a plan for family reunification. The case plan identified the goal that M.G. return home, with a projected completion date of July 13, 2021. The case plan required Father to, among other things, demonstrate that he could provide and maintain a safe home, stable income, and live in an environment free of drugs, drug paraphernalia, angry outbursts, domestic violence, and physical violence. He was also required to develop and demonstrate strategies for managing

14

mental health symptoms; to participate in parenting education courses, individual therapy and drug and alcohol classes; and to submit to a psychological evaluation and random drug testing.

The Department reported that ICWA "does not apply," outlining the responses received from the United Keetoowah Band of Cherokee Indians, the Eastern Band of Cherokee Indians, and the Cherokee Nation, and the juvenile court's ICWA ruling at the jurisdiction hearing.

On January 19, 2021, the juvenile court called the matter for a disposition hearing. Mother's counsel told the court that Mother was "prepared to submit on the recommendation" and "want[ed] to move forward with the case plan." Father's counsel, however, reported that Father "has sent me some email feedback about some parts that he's not happy with. I've let him know his choices are to either submit on the report as written or to set a contest. I don't know what he wants to do." The court asked Father, "do you wish to contest this with a hearing or do you wish to submit?" Father responded that the case plan was "unclear" because "there's some things in that I think should be more explained before, before I agree to something like this." The court then set the matter for a contested disposition hearing on January 27, 2021.

At the start of the January 27 hearing, Father's counsel informed the juvenile court that Father had spoken to the social worker and was "now prepared to submit on the case plan." On voir dire, Father testified that he "spoke with the social worker concerning one of the things I was concerned with. . . . And she made it clear to me what I would be agreeing to, and what classes I would be participating in. So she's okay with the case plan that she's giving me. And she seems to already be aware of what exactly she wants me to do. She's okay with it. I'm fine with it. I'm fine with the case

15

plan. I'm ready to move forward." Father confirmed he had a copy of the case plan and had no further questions about it. When asked whether he was "prepare[d] to comply with the case plan, and have the court review this matter in six months," Father replied, "Yes, of course."

The juvenile court ordered M.G. removed from his parents' custody based on "the facts of the sustained petition, the social worker's report and the evidence presented" and set the six-month review hearing for July 2021. The Department then raised the issue of J.B.'s placement request and argued that "pursuant to . . . section 361.3, the Court actually needs to make a finding on the record that . . . the placement has been denied, and state on the record the reasons that placement with the relative was denied.

Accordingly, the juvenile court heard testimony from Father, J.B., and Mother on J.B.'s placement request. Father testified that the statements in the Department's report about J.B. were false and that J.B. should be M.G.'s caregiver until the parents were able to regain custody. Mother likewise testified that it was her preference M.G. be placed with J.B.

M.G.'s counsel argued that placement with J.B. was not in the minor's best interest. Counsel was "very, very concerned about the trust situation" between J.B. and the Department because "[i]t's extremely important for a foster parent to be able to work closely with the Department, and follow all of the rules and regulations, some of which have to do with not getting overly involved in case issues, just providing care for the child." M.G.'s counsel also raised concern for the minor's welfare in that J.B. lived in Davis while the parents lived in Napa.

J.B. was questioned extensively regarding the Department's concerns. She denied disparaging M.G.'s foster caregiver and testified she believed the foster caregiver to be a good person, but was advised by the assistant director

16

of social services to put the allegation of the foster caregiver's drug use in writing. J.B. admitted she was not a certified nurse midwife but explained she had a "Certificate of Midwifery" from Mercy in Action College of Midwifery. She further testified that she was a lactation specialist, and that Mother had called her many times to ask about breastfeeding. J.B. continued to believe M.G. was at risk of developmental and cognitive delays and physical and emotional deficits based on "[t]he risk factors in his medical chart," but she acknowledged that M.G. had no known developmental delays. She denied advising the parents not to sign the consent-to-treat form and claimed that Father had simply wished to speak to his attorney before signing it. J.B. expressed her commitment to working with the Department and providing for visitation between the parents and M.G. in Napa.

After hearing further argument from counsel, the juvenile court denied placement with J.B., indicating it was in M.G.'s best interest to remain in his current placement "for the time being." The court acknowledged it was "not an easy decision" but found that M.G. was "doing well in the current placement," and that placement with J.B. was not suitable because she had "contributed to a distrustful relationship between herself and the Department" and had demonstrated "boundary issues with the mother." Moreover, the court found, J.B. had "made a lot of medical diagnoses" and was unwilling to trust the experts or the Department. In the court's words, "There's just been a level of distrust and advocacy that I think has caused damage, and will continue to create problems in working with the Department."

In its written disposition order, the juvenile court ruled, in relevant part: M.G. was not an Indian child and ICWA did not apply; M.G. was declared a dependent child and removed from his parents' custody, with

17

family reunification services and a return date goal of July 2021; the parents were granted supervised visitation; J.B.'s request for relative placement was denied; and a six-month review hearing was set for July 2021.

Father and J.B. each appealed. The appeals were consolidated for purposes of briefing, oral argument (if any), and disposition.

DISCUSSION

## I.  Scope of Father's Appeal

Dependency appeals are governed by section 395, which makes the disposition order the appealable judgment. Jurisdiction findings can be reviewed on appeal from the disposition order. (*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 112.) "A consequence of section 395 is that an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150.) Furthermore, " ' "[o]ur jurisdiction on appeal is limited in scope to the notice of appeal and the judgment or order appealed from." [Citation.] We have no jurisdiction over an order not mentioned in the notice of appeal.' " (*In re J.F.* (2019) 39 Cal.App.5th 70, 75 (*J.F.*).)

Father purports to appeal from the jurisdiction findings and disposition order, but his notice of appeal (Judicial Council Forms, form JV-800) identifies only the juvenile court's order denying relative placement. Specifically, in the area after the preprinted sentence "I appeal from the findings and orders of the court *(specify date of order or describe order)*," the notice states: "Denial of placement per parent's request to [J.B.], Mother and Child's relative." On the following page, after the sentence, "The order appealed from was made under Welfare and Institutions Code *(check all that apply)*," the form lists various statutory sections with boxes that can be

18

checked, but Father did not check the boxes in section 7(b) for "Section 360 (declaration of dependency)," "Removal of custody from parent or guardian," "Other orders," or "with review of section 300 jurisdictional findings." The only box checked was in section 7(f), "Other appealable orders relating to dependency *(specify)*," once again specifying "Denial of placement with relative at disposition per WIC 361.3" and identifying the hearing date as "1/27/21[.]"

Generally, we must liberally construe a notice of appeal in favor of its sufficiency. (Cal. Rules of Court, rules 8.100(a)(2), 8.405(a)(3).) However, " '[t]he policy of liberally construing a notice of appeal in favor of its sufficiency [citation] does not apply if the notice is so specific it cannot be read as reaching a judgment or order not mentioned at all.' [Citations.] '[I]t is well "beyond liberal construction" to view an appeal from one order as an appeal from a "further and different order." [Citation.] "Despite the rule favoring liberal interpretation of notices of appeal, a notice of appeal will not be considered adequate if it completely omits any reference to the judgment being appealed." [Citation.] . . . . Therefore, when a notice of appeal manifests a ' "clear and unmistakable" ' intent to appeal only from one order, we cannot liberally construe the notice to apply to a different, omitted order." (*J.F., supra,* 39 Cal.App.5th at p. 76.)

Here, the notice of appeal, prepared by Father's appointed counsel, manifests Father's clear and unmistakable intent to appeal only from the order denying relative placement. The notice twice describes that ruling—and only that ruling—and cites only the specific statute regarding relative placements (§ 361.3), while leaving unchecked the boxes for appealing from other judgments and orders—including the removal order and the jurisdiction findings. Because the notice of appeal completely omits any

19

reference to the jurisdiction findings and disposition order, we cannot liberally construe the notice to encompass the unmentioned rulings.[6]

We recognize that lack of prejudice to the respondent is a relevant consideration in applying the policy of liberal construction (*In re Joshua S.* (2007) 41 Cal.4th 261, 272), and that the Department identifies no prejudice or confusion resulting from Father's notice of appeal. Nonetheless, the policy of liberal construction is simply inapplicable where, as here, the notice of appeal manifests a clear and unmistakable intent to appeal only from a specified order. (*J.F.*, *supra*, 39 Cal.App.5th p. 76.) Thus, the absence of prejudice is immaterial.

Father nevertheless contends that under *In re Madison W.* (2006) 141 Cal.App.4th 1447 (*Madison W.*), we have discretion to construe his notice of appeal to encompass the unmentioned rulings. In *Madison W.*, the Court of Appeal construed a notice of appeal citing only a parental rights termination order under section 366.26 to encompass an order denying the parent's section 388 petition issued three days prior, as the notice of appeal was timely as to both orders. (*Madison W.*, at p. 1450.) The *Madison W.* court stated it "routinely" deemed a notice of appeal challenging the termination of parental rights to include an "eleventh-hour section 388 petition" that was filed on or before the termination order but within 60 days of when the notice of appeal was filed. (*Madison W.*, at p. 1450.) Though not condoning the practice of drafting notices of appeal in this manner, *Madison W.* explained it was being "pragmatic" due to concerns of ineffective assistance of counsel

---

[6] We do, however, have jurisdiction to consider Father's arguments regarding ICWA, which can be raised at any time. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 9; *In re Samuel P.* (2002) 99 Cal.App.4th 1259, 1267–1268.)

claims, motions to dismiss, and the consumption of limited judicial resources reviewing such matters. (*Id.* at p. 1451.)

As *J.F.* observed, however, *Madison W.* failed "to recognize the well-settled limits on the rule of liberal construction." (*J.F.*, *supra*, 39 Cal.App.5th at p. 78.) Furthermore, the discretionary rule announced in *Madison W.* was in response to frequent section 388 petitions filed at the "eleventh-hour" to avert termination of parental rights. (*Madison W.*, *supra*, 141 Cal.App.4th at p. 1450.) Those circumstances are absent here. We are not aware of any case applying *Madison W.* to a notice of appeal that clearly and unambiguously specifies a narrow dependency ruling, such as the denial of relative placement. Nor does Father demonstrate that the situation presented here arises so frequently as to justify a pragmatic workaround as in *Madison W.*

In any event, even if we were to construe Father's notice of appeal as encompassing the jurisdiction and disposition rulings, we would conclude that Father forfeited his challenge to the disposition order and that substantial evidence supported the jurisdiction findings.

### a. Disposition Order

A parent in a dependency proceeding who submits to a county welfare department's recommended findings and orders—as distinct from the department's report—waives for appellate purposes any right to challenge the court's issuance of its recommended findings and orders. (*In re Richard K.* (1994) 25 Cal.App.4th 580, 590 (*Richard K.*).) Submission on the *report* simply means "the parent acquiesces as to the state of the evidence yet preserves the right to challenge it as insufficient to support a particular legal conclusion." (*Id.* at p. 589.) By contrast, submission on the county welfare department's *recommendations* waives the parent's right to contest the juvenile court's disposition if it coincides with the department's

21

recommendations, as a parent "who consents to an act is not wronged by it." (*Richard K.*, *supra*, 25 Cal.App.4th at p. 590.)

Father insists he did not forfeit his challenge to the disposition order, noting that the disposition hearing was "contested" and that the minute order stated Father submitted "on the report." In context, however, the record makes reasonably clear that Father submitted to the Department's recommendations. At a hearing on January 19, 2021, the juvenile court set the matter for a "contested" hearing on January 27 based on representations by Father's counsel that Father was unhappy with the case plan and counsel did not "know what [Father] wants to do." But at the start of the January 27 hearing, Father's counsel informed the court that Father had talked to the social worker and was "prepared to submit on the *case plan*." (Italics added.) On voir dire, Father testified the social worker clarified "what [he] would be agreeing to, and what classes [he] would be participating in," and therefore, he was "fine with the case plan." Father also confirmed he was prepared to comply with the case plan and have the court review the matter in six months. Despite contrary language in the minute order, the reporter's transcript confirms that Father was submitting on the recommended "case plan," as opposed to the "report." (*People v. Stephenson* (1974) 10 Cal.3d 652, 656 [reporter's transcript controls over discrepancies in minute order].)

That Father agreed to submit to the case plan after clarifying what he was "agreeing to" and what "classes" he had to take can only be understood as his acquiescence to the steps outlined by the Department for family reunification—that is, the Department's recommendations. Furthermore, Father's agreement that the juvenile court would review the matter in six months was consistent with the case plan's goal of family reunification by July 2021. In sum, even if we were to exercise appellate jurisdiction over the

22

disposition order, we would conclude Father forfeited his appeal from that order by submitting to the Department's recommendations. (*Richard K.*, *supra*, 25 Cal.App.4th at p. 590.)

### b. Jurisdiction Findings

Jurisdiction under section 300, subdivision (b), requires proof, by preponderance of the evidence, that the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." (§§ 300, subd. (b)(1), 355, subd. (a).) Although risk to the child must be shown to exist at the time of the jurisdiction findings (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1435), the juvenile court need not wait until a child is seriously injured to assume jurisdiction if there is evidence that the child is at risk of future harm (*In re N.M.* (2011) 197 Cal.App.4th 159, 165).

"Physical violence between a child's parents may support the exercise of jurisdiction under [section 300,] subdivision (b) but only if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 (*Daisy H.*).) While evidence of past conduct, without more, is insufficient to support a jurisdiction finding under section 300, it conduct may be probative of current conditions. (*In re James R.* (2009) 176 Cal.App.4th 129, 135–136.) To establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur." (*Id.* at p. 136.)

On appeal, we review jurisdiction findings for substantial evidence. (*J.K.*, *supra*, 174 Cal.App.4th at p. 1433.) " '[W]e view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable

inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment.' " (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.)

Here, substantial evidence supported dependency jurisdiction based on paragraph b-4 of the petition, which alleged that Father committed intimate partner violence against Mother on two occasions in October 2019 and July 2020. The allegations of both incidents were supported by Napa Police Department reports. In the July 2020 incident, Mother reported that Father had threatened to kill her and their unborn baby and damaged a door, leading Mother to request and obtain an emergency protective order against him. Although Father's acts of violence against Mother in October 2019 occurred prior to M.G.'s conception, the trial court could permissibly conclude that this instance of violence—coupled with Father's direct threat to kill the unborn baby eight months later—was probative of conditions existing at the time of the dependency to support a finding that Father's violent tendencies were ongoing and that M.G. was at risk of future physical harm. That Mother never filed charges against Father and remained willing to stay with him supported the juvenile court's conclusion that Mother was unable "to make wise choices to protect the safety of her child." Notwithstanding both parents' denials of the Department's allegations, we defer to the juvenile court's finding that their testimony was not credible in this respect.

Moreover, the juvenile court's credibility findings were corroborated by the additional evidence of Mother's 911 calls and other accounts of Father's violent behavior in the year leading up to M.G.'s birth. The evidence included Mother's "scared" and "frantic" 911 call in June 2020 in which she told the dispatcher that Father was threatening to hurt her and that she did not

"want this man to have contact with her unborn child due to being in fear of him[.]" The Rainbow House incident, which occurred shortly before M.G.'s birth, involved not only Father's violent and angry conduct but his threat against an infant child. Finally, Father's angry "charge" toward Mother's great-grandmother, which required intervention from J.H. and the police, occurred just two days before M.G.'s birth.

In sum, the evidence, viewed in a light most favorable to the juvenile court's determination, supported a finding beyond mere speculation that Father's violent tendencies were likely to continue and placed the child at substantial risk of future physical harm. (*Daisy H., supra*, 192 Cal.App.4th at p. 717.) Because the juvenile court's exercise of jurisdiction over a child will be upheld if substantial evidence supports any one of the statutory bases for jurisdiction enumerated in the petition, the true finding as to paragraph b-4 was sufficient to sustain dependency jurisdiction in this case. (*In re M.R.* (2017) 7 Cal.App.5th 886, 896.)[7]

## II.    Relative/NREFM Placement

Father and J.B. contend the juvenile court's denial of relative placement was an abuse of discretion because the court failed to consider several of the statutory factors for relative placement determinations and gave undue weight to the "best interest" factor (§ 361.3, subd. (a)(1)). However, the Department contends, and Father and J.B. concede, that J.B. is

---

[7]    Father requests our review of the sufficiency of the evidence supporting paragraphs b-5 and g-1, arguing that the true findings on these paragraphs could have "substantially adverse collateral consequences" for him. We decline to exercise our discretion to do so. Father's claim of future impact is speculative and conclusory, as he fails to provide any meaningful argument as to how the true findings could affect a future dependency, family law, or other proceeding. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1494–1495.)

not a "relative" within the meaning of section 361.3, subdivision (c)(2), because she is not within the fifth degree of kinship to M.G.

Father and J.B. alternatively contend the juvenile court abused its discretion in denying placement because J.B. was an NREFM. We conclude this argument was forfeited and, in any event, lacks merit.

Where a child has been removed from a parent's care under section 361, and the child is not placed with a noncustodial parent or relative, the child may be placed in the approved home of an NREFM. (*In re Joshua A.* (2015) 239 Cal.App.4th 208, 213–214 (*Joshua A.*).) We will not disturb a juvenile court's placement decision " ' "unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Section 362.7 defines an NREFM as "an adult caregiver who has an established familial relationship with a relative of the child, as defined in [section 361.3, subdivision (c)(2)], or a familial or mentoring relationship with the child. The county welfare department shall verify the existence of a relationship through interviews with the parent and child or with one or more third parties. The parties may include relatives of the child, teachers, medical professionals, clergy, neighbors, and family friends." The statute further provides that "[w]hen the home of [an NREFM] is being considered for placement of a child, the home shall be evaluated, and approval of that home shall be granted or denied, pursuant to the same standards set forth in the regulations for the licensing of foster family homes that prescribe standards of safety and sanitation for the physical plant and standards for basic personal care, supervision, and services provided by the caregiver."

The issue of whether J.B. was a suitable NREFM placement for M.G. was never presented to the juvenile court below. Thus, any claim of error

26

based on this contention is forfeited on appeal. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222.) In any case, Father and J.B. provide no analysis or supporting authority for their assumption that J.B. satisfied the statutory definition of an NREFM as set forth above. (See § 362.7.) Although they emphasize that J.B. was M.G.'s godmother and Mother's cousin, they provide no meaningful analysis for concluding that J.B.'s mere status as M.G.'s godmother demonstrates "a familial or mentoring relationship with the child," or that her mere cousinship with Mother shows "an established familial relationship with a relative of" M.G. within the meaning of section 362.7. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408–409 [claim of error lacking meaningful analysis is forfeited].)

Furthermore, Father and J.B. have pointed to no evidence in the record indicating that J.B.'s home was found to have met regulatory standards for the licensing of foster family homes. (§ 362.7.) Although the record contains various documents related to J.B.'s application to become a certified foster parent, including certificates of completion of foster care education courses, she indicated in her December 2020 relative information form (JV-285) that she was still "in the process of becoming fully approved as a resource parent in Yolo County." At the disposition hearing in January 2021, the Department told the juvenile court that it "was waiting" on the child welfare department of Yolo County to conduct a home study.

Additionally, we find no abuse of discretion in the juvenile court's conclusion that placement with J.B. would not have been in M.G.'s best interests. (*Joshua A.*, *supra*, 239 Cal.App.4th at p. 218 [placement under section 362.7 must be in child's best interests]; *Samantha T.*, *supra*, 197 Cal.App.4th at p. 111 [same].) " ' "The concept of a child's best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a

27

child's opportunity to develop into a stable, well-adjusted adult.' [Citation.]" '

[Citation.] We review the juvenile court's order for abuse of discretion.

'[R]eversal is warranted only if there is no reasonable basis upon which the trial court could conclude that its decision advanced the best interests of the child.' " (*Joshua A.*, at p. 218.) "When the exercise of the court's discretion depends on how it resolves questions of fact, we must defer to the court's ' "credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' " (*Nissan Motor Acceptance Cases* (2021) 63 Cal.App.5th 793, 817.)

Here, the juvenile court's discretionary decision to deny placement with J.B. was based on its factual determinations that M.G. was doing well in his foster placement and that J.B. had "contributed to a distrustful relationship between herself and the Department," demonstrated "boundary issues" with Mother, and was unwilling to trust in experts and the Department. Father and J.B. do not dispute that M.G. was doing well in foster care, and the record reflects that M.G. had no known developmental delays. Meanwhile, there was substantial evidence in the record of J.B. prioritizing her judgment over those of child welfare personnel and medical providers, making unfounded or untrue accusations against the foster caregiver, and being uncooperative with the Department. Although we do not doubt the sincerity of J.B.'s intentions or concerns for M.G. and his family, we conclude it was not unreasonable for the juvenile court to find that her conduct would not advance the child's best interests during efforts to reunify the family. Father's extensive arguments attempting to explain J.B.'s actions and blaming the Department for causing the distrust do not persuade us otherwise. On review for abuse of discretion, where two or more inferences can reasonably be deduced from the facts, we have no authority to substitute

28

our decision for that of the lower court.  (*In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 465.)

Father contends the juvenile court's discretionary decisions may be reversed if improper criteria were applied or incorrect legal assumptions were made, but he fails to show that such errors occurred here.  Instead, Father argues in conclusory fashion that the Department was "bias[ed]" against J.B., that its accusations were "disingenuous" and "self-serving," and that the juvenile court "bowed to the Department's decision" because it did not accept J.B.'s "perfectly reasonable explanations for the matters the Department used against her[.]"  These arguments merit little discussion, as Father seeks to improperly relitigate factual determinations that were within the province of the juvenile court.

Similarly, Father's oft-repeated claim that the juvenile court failed in its "critical 'oversight role' " of placement decisions (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1306) is based on little more than the fact that the court's decision ultimately coincided with the Department's.  This circumstance does not evidence bias or an abuse of discretion.  Moreover, the record shows the court did not rubber stamp the Department's decision to deny placement with J.B.  Rather, it reached its decision after receiving the Department's reports, J.B.'s relative information forms and supporting documents, and testimony from both parents and J.B. at the disposition hearing.  The court then explained the basis for its decision, which, as discussed, was not outside the bounds of reason and was based on factual findings supported by substantial evidence.

For all of these reasons, we conclude the juvenile court did not abuse its discretion in denying relative or NREFM placement with J.B.

## III. ICWA Compliance

Father contends the juvenile court's ICWA finding must be reversed because the Department did not adequately investigate M.G.'s possible Indian ancestry. We agree.

"ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions." (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1396.) "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subds. (a), (b).)

"ICWA established minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (*D.S.*).) As relevant here, "section 224.2 creates three distinct duties regarding ICWA in dependency proceedings." (*D.S.*, *supra*, 46 Cal.App.5th at p. 1052.) After a child welfare department's initial contact with the minor and his or her family, "the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the [Department] 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e).) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply." (*D.S.*, at p. 1052.)

30

Juvenile courts and county welfare departments "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a).)  When there is reason to believe an Indian child is involved in a proceeding, "the court, social worker, or probation officer shall make further inquiry regarding the possible Indian status of the child . . . as soon as practicable. . . [¶] Further inquiry includes, but is not limited to, . . . [¶] [i]nterviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.3."  (§ 224.2, subd. (e)(2)(A).)

If the juvenile court finds that the Department has conducted "proper and adequate further inquiry and due diligence" and that there is no reason to know whether the child is an Indian child, the court may make a finding that ICWA does not apply to the proceedings.  (§ 224.2, subd. (i)(2).) However, the Department and the court have a continuing duty under ICWA, and the court "shall reverse its determination if it subsequently receives information providing reason to believe that the child is an Indian child and order the social worker or probation officer to conduct further inquiry[.]" (§ 224.2, subd. (i)(2); see *D.S.*, *supra*, 46 Cal.App.5th at p. 1050.)

"[R]eason to know a child involved in a proceeding is an Indian child" exists when, among other things, "[a] person having an interest in the child, including . . . a member of the child's extended family[,] informs the court that the child is an Indian child." (§ 224.2, subd. (d)(1); 25 C.F.R. § 23.107, subd. (c)(1).)  "Under both ICWA and California law, ' "extended family member[s]" ' include the child's 'grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.' " (*D.S.*, *supra*, 46 Cal.App.5th at p. 1053.)

31

Where there is a reason to know a child is an Indian child, section 224.3 requires that formal notice be given to the minor's parents or legal guardian, Indian custodian, if any, and the child's tribe regarding any hearings that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement. (§ 224.3, subd. (a).) Section 224.3, subdivision (a)(5), sets forth the information that must be included in the notice, including "[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known." (§ 224.3, subd. (a)(5)(C).) The notice "must include enough information for the tribe to 'conduct a meaningful review of its records to determine the child's eligibility for membership' [citation], including the identifying information for the child's biological parents, grandparents, and great-grandparents, to the extent known[.]" (*D.S.*, *supra*, 46 Cal.App.5th at p. 1050; see § 224.3, subd. (a)(5)(C).)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*D.S.*, *supra*, 46 Cal.App.5th at p. 1051.)

Here, the Department's continuing duty of inquiry was unquestionably triggered at the detention hearing when Mother and maternal grandfather J.H. informed the juvenile court of possible Native American ancestry on the maternal side of the family. Notably, the colloquy at the hearing revealed there was reason to believe the child might have Indian ancestry from *both* of

32

Mother's parents—J.H. and A.L.—which was acknowledged by the Department in its jurisdiction and disposition reports. While the Department and the court obtained basic information about J.H. and his parents, we see no indication in the record that the Department engaged in any further inquiry as to A.L.

As the child's maternal grandmother, A.L. was an "extended family member" for purposes of the Department's duty of further inquiry. (§ 224.2, subd. (e)(2)(A); *D.S.*, *supra*, 46 Cal.App.5th at p. 1053.) The record suggests A.L. was readily available to provide information to the Department, as she attended some of the hearings. It goes without saying that A.L. could have provided the Department with the names of her parents and her own full birthdate, as well as any former names and addresses, and it is possible she could have provided more detailed information about her parents such as their dates and places of birth. Although we agree with the Department that it was not required to *interview* the child's great-grandparents in order to satisfy its duty of inquiry under section 224.2, subdivision (e)(1) (*D.S.*, *supra*, 46 Cal.App.5th at p. 1053), it was at least required to interview A.L. in order to obtain the child's great-grandparents' information. (§§ 224.2, subd. (e)(2)(A), 224.3, subd. (a)(5)(C).)

The Department contends it went beyond what was called for by "sending formal notices to each of [the tribal] entities and receiving confirmation from all three tribes that M.G. was not eligible for membership even though there was not 'reason to know' he was an Indian Child." While we agree there was not yet reason to *know* that M.G. was an Indian child (and therefore the formal notice provisions of section 224.3 were not triggered), the Department's early issuance of ICWA notices did not dispense with further inquiry and due diligence, and to the extent the notices were

33

part of the Department's inquiry efforts, it was incumbent on the Department to provide as much information as possible to assist the notice recipients in attempting to determine M.G.'s tribal membership or eligibility. (See § 224.2, subd. (e)(2)(B) [further inquiry includes contacting the U.S. Department of the Interior, Bureau of Indian Affairs; the State Department of Social Services; tribes; and any persons that may reasonably be expected to have information], (C) [contact with tribe shall include sharing information necessary for tribe to make membership or eligibility determination].) Without interviewing A.L to obtain basic information about herself and her parents, and having left the spaces for her parents' information "Unknown" in all three rounds of ICWA notices, the Department gave the recipients little information from which to determine if there was tribal eligibility stemming from A.L.'s family history.

Likewise, to the extent the ICWA notices were intended as information-sharing with the tribes in furtherance of the Department's duty of inquiry (§ 224.2, subd. (e)(2)(C)), the spelling discrepancy regarding the surname of J.H. and R.H. may have hindered the tribes' ability to conduct a meaningful review of their records. It is unclear why there was a discrepancy in the spellings between the ICWA notices and the statements made at the detention hearing, but on the record before us, we cannot ascertain whether the misspelling was in the ICWA notices themselves or in the reporter's transcript of the detention hearing. Nor is there any indication that the Department or the juvenile court attempted to clarify this discrepancy.

We acknowledge the Department was not required to "cast about" for information or pursue unproductive investigative leads. (*In re Levi U.* (2000) 78 Cal.App.4th 191, 199.) But given the Department's acknowledgment that there was possible Indian ancestry stemming from A.L., as well as her

apparent availability throughout the dependency proceedings, we cannot conclude this was an unproductive avenue of inquiry. Even where "[a]dditional investigation may not develop further information establishing the need for ICWA notice, . . . it is essential to the enforcement of the court's and [the Department's] 'affirmative and continuing duty to inquire' to construe broadly the duty to make further inquiry." (*In re T.G.* (2020) 58 Cal.App.5th 275, 295.)

Based on the foregoing, we conclude substantial evidence was lacking to support the juvenile court's findings that proper and adequate further inquiry and due diligence had been conducted and that ICWA does not apply. (§ 224.2, subd. (i)(2).)[8] We cannot conclude the error was harmless. The record does not show that the Department made any effort to interview A.L. to obtain information on her and her parents, and the ICWA notices sent to the tribes as part of the Department's duty of inquiry did not contain A.L.'s family history information and also may have misspelled the names of maternal grandfather J.H. and great-grandfather R.H. Meanwhile, the responses received from the Eastern Band of Cherokee Indians, United Keetoowah Band of Cherokee Indians, and Cherokee Nation indicated that their determinations were based on the information provided and could change if the information they received was incorrect or incomplete. On this

---

[8]     However, we reject Father's remaining contentions that ICWA compliance was lacking due to incomplete information about M.G.'s birth certificate and Father's parentage in the ICWA notices, and the Department's failure to interview J.B., C.C., and C.H. about their Indian ancestry. (See *D.S., supra,* 46 Cal.App.5th at p. 1053 ["extended family member" does not include great-grandparents]; *In re Charlotte V.* (2016) 6 Cal.App.5th 51, 58 [no requirement under ICWA or California law that information about nonlineal ancestors be provided].)

record, we find the claim of ICWA error to be prejudicial and reversible. (*In re N.G.* (2018) 27 Cal.App.5th 474, 484.)

## DISPOSITION

The disposition order of the juvenile court is conditionally reversed. (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 705–706.) The juvenile court is directed to order the Department to investigate and obtain complete and accurate information, if known, about M.G.'s maternal relatives (specifically A.L., her parents, J.H., and R.H.) and to provide corrected ICWA notices to the relevant tribes. If a tribe intervenes after receiving proper notice, the court shall proceed in accordance with ICWA. If no tribe intervenes or otherwise responds after receiving proper notice, the disposition order shall be reinstated.

Additionally, the juvenile court is directed to correct the January 27, 2021 minute order of the disposition hearing to reflect that Father submitted on the Department's recommended case plan. (*People v. Mitchell* (2001) 26 Cal.4th 181, 188.)

In all other respects, the orders are affirmed.

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P. J.


_____
Petrou, J.


A161940, A162302/*Napa County Health and Human Services v. M.G., J.B.*